[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 15, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-15549

_____

Tax Court  No. 3512-03

ESTATE OF FRAZIER JELKE, III,
Deceased,
WACHOVIA BANK, N.A.,
f.k.a. First Union National Bank, Personal Representative,

Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Appeal from a Decision of the
United States Tax Court

_____

**(November 15, 2007)**

Before TJOFLAT, CARNES and HILL, Circuit Judges.

HILL, Circuit Judge:

This estate tax case presents on appeal an issue of first impression in this circuit.[1] It involves the proper valuation for estate tax purposes of a 6.44% stock interest, or 3,000 shares, owned by the decedent, Frazier Jelke III (Jelke or decedent or estate),[2] in a closely-held, investment holding company, Commercial Chemical Company (CCC), owning appreciated, marketable securities.[3]

The issue is whether or not the Tax Court used the appropriate valuation methodology in computing the net asset value of CCC to determine the value of Jelke's interest in CCC for estate tax purposes on the date of death. The Tax Court, adopting the Commissioner's expert witness appraiser's approach, allowed the estate only a partial $21 million discount for CCC's built-in capital gains tax liability, indexed to reflect present value on the date of Jelke's death, using projections based upon the court's findings as to when the assets would likely be

---

[1] The issue has been previously addressed by the Second Circuit in 1998, the Sixth Circuit in 2000, and the Fifth Circuit in 2001 and 2002. See IV.C.2 & 3, infra.

[2] The 3,000 shares were held in a revocable trust of which Jelke was the primary beneficiary. The revocable trust terminated at Jelke's death, and its assets were distributed to his issue.

[3] At all times, CCC was a C corporation for tax purposes. From 1922 to 1974, CCC was a successfully operating chemical manufacturing business, producing chemicals such as arsenic acid and calcium arsenate. In 1974, CCC sold its manufacturing assets to an unrelated third party, yet maintained its name, CCC, as a holding company investing the sales proceeds. At the date of Jelke's death, CCC's stock portfolio was comprised of 92% blue-chip domestic equities and 8% international equities, the market values of which were readily and easily available.

sold and when the tax liability would likely be incurred, i.e., in this case, over a sixteen-year period. Using what could be termed an economic market reality theory, the estate argued, under the rationale set forth by the Fifth Circuit Court of Appeals in Estate of Dunn v. Comm'r, 301 F.3d 339 (5th Cir. 2002), that a 100% dollar-for-dollar discount was mandated for CCC's entire contingent $51 million capital gains tax liability. Under this theory, it is assumed that CCC is liquidated on the date of Jelke's death, the valuation date, and all assets of CCC are sold, regardless of the parties' intent to liquidate or not, or restrictions on CCC's liquidation in general.

Based upon the following historical overview, discussion, and precedential authority, we are in accord with the simple yet logical analysis of the tax discount valuation issue set forth by the Fifth Circuit in Estate of Dunn, 301 F.3d at 350-55, providing practical certainty to tax practitioners, appraisers and financial planners alike. Under a de novo review, as a matter of law, we vacate the judgment of the Tax Court and remand with instructions that it recalculate the net asset value of CCC on the date of Jelke's death, and his 6.44% interest therein, using a dollar-for-dollar reduction of the entire $51 million built-in capital gains tax liability of CCC, under the arbitrary assumption that CCC is liquidated on the date of death

3

and all assets sold.[4]

## I.  FACTUAL BACKGROUND[5]

Jelke died testate on March 4, 1999, in Miami, Florida.  On the date of his

death, CCC's marketable securities had a fair market value of $178 million, plus a

built-in contingent capital gains tax liability of $51 million on those securities.

Combined with $10 million in other CCC assets, without regard to the tax liability,

CCC's net asset value totaled $188 million.[6]

On the estate's federal estate tax return filed December 6, 1999, Jelke's

6.44% interest in CCC, held through his revocable trust, was included in his gross

estate under Section 2031 at a value of $4,588,155.  I.R.C. § 2031.  The estate

---

[4] Upon our thorough review of the record, we are satisfied that the Tax Court did not clearly err when it determined and discounted the value of Jelke's 6.44% interest in CCC for lack of control by 10%, and for lack of marketability by 15%.  These two issues are affirmed without further discussion.

[5] Many of the facts were stipulated to by the parties and set forth in the Tax Court's findings of fact.  Estate of Jelke v. Comm'r, 89 T.C.M. (CCH) 1397 (2005).  Only facts pertinent to this appeal will be recited here.

[6] All parties agree that CCC is well managed by experienced individuals.  Its board of directors is elected by CCC shareholders.  Under CCC's articles of incorporation, shareholders are not allowed to participate in the operation or management of the investment holding company, nor do they show any interest to do so.  CCC's primary investment goal is long-term capital stock growth.  CCC had a relatively high annual rate of return, or 23%, for the five-year period [1994-1998] prior to death, lagging just behind the S & P 500's historical average for the same time period.  CCC paid steady annual dividends.  Its long-term investment goals produced a low asset annual turnover rate of 6%, and $51 million in unrealized capital gains.  During the five years prior to death, there was no intent to liquidate CCC.

calculated this figure by reducing CCC's $188 million net asset value by $51 million, or 100% of the built-in capital gains tax liability. It then applied a 20% discount for lack of control and a 35% discount for lack of marketability.

In his December 2, 2002, notice of deficiency issued to the estate, the Commissioner determined that Jelke's estate owed a deficiency in estate tax of $2,564,772, resulting from an undervaluation of Jelke's 6.44% interest in CCC.[7] The Commissioner determined that the value of Jelke's 6.44% interest in CCC was $9,111,000, not the $4,588,155, claimed by the estate. Unlike the estate's 100% discount, he calculated the $9,111,000 using a zero discount for built-in capital gains taxes, and what he described as "reasonable" discounts for lack of control and lack of marketability.

## II. PROCEDURAL BACKGROUND

The estate filed a petition in Tax Court in March 2003, contesting the Commissioner's $9,111,000 fair market value of Jelke's 6.44% interest in CCC stock on the date of death. It claimed that the Commissioner had based his value on an incorrect net asset value of CCC, by declining to discount CCC's net asset

---

[7] The other CCC shareholders are irrevocable trusts, holding interests in CCC ranging from 6.18% to 23.668%, the beneficiaries of which are all related Jelke family members. From 1988 to the date of trial, there were no sales of CCC stock. There are no restrictions on the sale or transfer of CCC stock under the terms of any of the Jelke family trusts. One trust does not terminate before the year 2019.

value of $188 million, by the $51 million in contingent built-in capital gains tax liability, accrued as of the date of death. The estate also claimed that the Commissioner undervalued the two additional discounts available to the estate, one for lack of marketability and one for lack of control.[8]

After a two-day bench trial, the Tax Court rejected the estate's position that CCC's net asset value must be reduced dollar-for-dollar by the entire amount of the built-in capital gains tax liability under Estate of Dunn, 301 F.3d at 351-53, as the Estate of Dunn was a Fifth Circuit, not an Eleventh Circuit, case. It determined that a discount was available, but not one for 100%.

The Tax Court noted that a hypothetical buyer of 6.44% of CCC stock single-handedly would be unable to cause or force a liquidation of CCC. It stated that CCC's long-term history of dividends and appreciation, with no immediate plans to liquidate (one trust continues until 2019), together with its low annual turnover of securities in the portfolio, belied the Estate of Dunn's threshold, arbitrary assumption of complete liquidation on the valuation date. Further, the Tax Court distinguished Estate of Dunn on the fact that the Fifth Circuit in Estate of Dunn was valuing a majority, not a minority, shareholder interest as was present here. Also the company valued in the Estate of Dunn was primarily (85%) an

_____

[8] See supra note 4.

6

operating company, unlike CCC, a 100% investment holding company.

Under the net asset valuation approach, the Tax Court adopted the

Commissioner's argument that the capital gains tax discount should be reduced to

present value, as computed on an annualized, indexed basis, over the sixteen-year

period it was expected to be incurred as the assets turned over.[9]  Instead of a $51

million reduction, the Tax Court's present value application to net asset value

resulted in a $21 million tax discount reduction, and a net deficiency in estate tax

of $1 million.[10]

This appeal follows.

## III.  STANDARD OF REVIEW

The question of whether the Tax Court used the correct standard to

determine fair market value is a legal issue.  See Powers v. Comm'r, 312 U.S. 259,

260 (1941).  We review de novo the Tax Court's rulings on the interpretation and

application of the tax code.  See Estate of Blount v. Comm'r, 428 F.3d 1338, 1342

---

[9] The estate attacks this approach on the basis that it is incomplete and inconsistent, as over this sixteen-year period, CCC's securities could appreciate in value, increasing tax payments and obviating the need to reduce built-in capital gains by present value principles.  The same could be true if the assets were to depreciate in value over the projected period.

[10] In addition, the Tax Court applied a 10% discount for lack of control and a 15% discount for lack of marketability.  As stated, supra note 4, we find no clear error in the Tax Court's analysis and calculation of the other two discounts available to the estate.  These two issues need no further discussion.

(11th Cir. 2005) (citation omitted). The Tax Court's findings of fact are reviewed for clear error. Id. Where a question of fact, such as valuation, requires legal conclusions, we review those underlying legal conclusions de novo. See Adams v. United States, 218 F.3d 383, 386 (5th Cir. 2000). A determination of fair market value is a mixed question of fact and law: the factual premises are subject to a clearly erroneous standard while the legal conclusions are subject to de novo review. See Estate of Dunn, 301 F.3d at 348 (citations omitted). "The mathematical computation of fair market value is an issue of fact, but determination of the appropriate valuation method is an issue of law that we review de novo." Id.

## IV. DISCUSSION

### A. Introduction

The issue in this case is, for estate tax purposes, the proper calculation of the magnitude of the discount for built-in capital gains taxes in valuing stock in a closely-held corporation on the date of death. A general overview of the applicable tax statutes, regulations and revenue rulings is appropriate.

#### 1. The Tax Code and Treasury Regulations

Section 2031(a) provides that the value of a decedent's gross estate shall be determined by including the value at the time of death of all property, real or

8

personal, tangible or intangible, wherever situated. I.R.C. § 2031(a). Section 20.2031-1(b) provides that the value of every item of property includable in a decedent's gross estate . . . is its fair market value at the time of the decedent's death. Treas. Reg. § 20.2031-1(b). The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.[11] Id. All relevant facts and elements of value as of the applicable valuation date shall be considered. Id.

### 2. Internal Revenue Service Guidelines

Revenue Ruling 59-60 provides the foundation for undertaking an analysis of a closely-held stock's value. Rev. Rul. 59-60, 1959-1 C.B. 237.[12] Although it has been modified and amplified over the years, Revenue Ruling 59-60 still remains the focal point for the proper method of valuing closely-held securities.[13]

---

[11] The buyer and seller are hypothetical, not actual persons, and each is a rational economic actor; that is, each seeks to maximize his advantage in the context of the market that exists on the valuation date. See Estate of Newhouse v. Comm'r, 94 T.C. 193, 218 (1990).

[12] While Revenue Ruling 59-60 sets forth the basic approach for valuing closely-held securities, it recognizes that there is no one correct method. Rev. Rul. 59-60, 1959-1 C.B. 237. All of the facts and circumstances of each individual case must be analyzed by the appraiser who is expected to use common sense and informed judgment and maintain "a reasonable attitude in recognition of the fact that valuation is not an exact science." Id. at § 3.01.

[13] Rev. Rul. 59-60, 1959-1 C.B. 237, modified by Rev. Rul. 65-193, 1965-2 C.B. 370, amplified by Rev. Rul. 77-287, 1977-2 C.B. 319, amplified by Rev. Rul. 80–214, 1980-2 C.B. 101, amplified by Rev. Rul. 83-120, 1983-2 C.B. 170.

Closely-held corporations, are, by definition, corporations of which the shares are owned by a relatively limited number of shareholders. Id. at § 2.03. Their shares are traded little, if any, in the marketplace so there are usually no asked prices or third-party sales that would represent an ascertainable basis for determining the fair market value of the stock under the rules generally applicable to publicly traded stock. Id.

The fair market value of closely-held securities also clearly depends upon the potential buying public's estimate of the worth of the securities. Id. at § 3.02. The level of risk that a buyer will be willing to accept in purchasing stock of a closely-held company will directly impact the value of that stock. Id.

Revenue Ruling 59-60 states that "[t]he value of the stock of a closely-held investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock." Id. at § 5(b). The net asset value method of valuation, which assumes that the value of the corporation is based upon the fair market value of its underlying assets, is in turn determined by applying the venerable willing buyer-willing seller test. Id. The net asset value method is the best method to use in valuing corporations that are essentially holding companies, while an earnings-based method applies to

operating companies.  Id.[14]

B.  Historical Overview of the Issue Presented on Appeal

1.    The Law Prior to the Tax Reform Act of 1986

In General Utilities & Operating Co. v. Helvering, 296 U.S. 200 (1935), the

Supreme Court held that a C corporation did not recognize taxable income at the

corporate level on a distribution of appreciated property to its shareholders.  Id. at

206.  Congress responded to this holding, later to become known as "the General

Utilities doctrine," by enacting Section § 311(a).[15]  From 1935 to 1986, the fair

market value of the distributed corporate property became the shareholders'

adjusted stepped-up basis in the property received.  It was therefore possible for a

corporation to distribute its appreciated assets to its shareholders without incurring

any income tax liability at the corporate level.  Id.; see also I.R.C. § 301(d).

With one exception during this fifty-one year period, case law did not allow

a discount for built-in capital gains tax liability when a sale or liquidation was

---

[14] The Tax Court agrees.  See, e.g., Estate of Smith v. Comm'r, 78 T.C.M. (CCH) 745, *5 (1999) (where the net asset valuation approach given greatest weight in valuing corporation engaged in farming operation, as the underlying value of the real property is the greatest contributor to the corporation's worth); Estate of Ford v. Comm'r, 66 T.C.M. (CCH) 1507 (1993), aff'd, 53 F.3d 924 (8th Cir. 1995); Estate of Andrews v. Comm'r, 79 T.C. 938 (1982).

[15] This new tax code statute provided in part: "[N]o gain or loss shall be recognized to a corporation on the distribution (not in complete liquidation) with respect to . . . (1) its stock (or rights to acquire its stock), or (2) property."  I.R.C. § 311(a).

11

neither planned nor imminent, as it was deemed by the courts to be too uncertain, remote or speculative.[16]  See Estate of Andrews v. Comm'r, 79 T.C. 938, 942 (1982) (projected capital gains taxes do not reduce the value of closely-held stock when liquidation is only speculative as it is unlikely taxes will ever be incurred); Estate of Piper v. Comm'r, 72 T.C. 1062, 1086-87 (1979) (in gift tax case, capital gains discount unwarranted under net asset value method where there is no evidence that a liquidation of the investment companies was planned); Estate of Cruikshank v. Comm'r, 9 T.C. 162, 165 (1947) (no sale of portfolio securities projected in closely-held family investment corporation).

The pre-1986 cases do not announce a rule of law that such taxes may never affect the value of stock, but that taxes will create an impact only when the taxpayers can prove that the assets will in fact be sold in the foreseeable short-term future, rather than held for long-term investment return.  See Obermer v. United States, 238 F.Supp. 29, 35-36 (D.Haw. 1964).  The pre-1986 cases are now, however superceded by statute.  See Tax Reform Act of 1986, Pub. L. No. 99-514, § 631, 100 Stat. 2085.

---

[16] The exception was Obermer v. United States, 238 F.Supp. 29 (D. Haw. 1964), where a capital gains discount was permitted when the taxpayer established that the assets were required to be sold by the corporation to meet the terms of a restrictive agreement.  Therefore, liquidation was proved by the taxpayer to be imminent and not speculative.  Id. at 35-36.

2.      The Tax Reform Act of 1986

The Tax Reform Act of 1986 (TRA 1986) made dramatic tax law changes. New rules were enacted to require the recognition of corporate-level gains on the distributions of appreciated property under Section § 311(b), thereby repealing the General Utilities doctrine and I.R.C. §§ 336 and 337.  See I.R.C. § 311(b).

Prior to the repeal of the General Utilities doctrine by TRA 1986, no corporate tax would have been required to be paid and no discount would have been allowed.  TRA 1986 required recognition of corporate-level gains and losses on liquidating sales and on distributions of corporate property.

With the repeal of the doctrine, courts began to recognize the possibility that a discount related to the capital gains taxes incurred should be allowable.  Due to the taxpayer's inability to receive a step-up in basis to fair market value on the valuation date after TRA 1986, it now became more important than ever for a taxpayer to be able to quantify his or her loss in value of the stock due to inherent capital gains tax liability in the corporation.[17]

---

[17] At a decedent's death, appreciated property included in the decedent's gross estate generally receives a Section 1014 "step-up" in basis so that the fair market value of the property is equal to its basis.  I.R.C. § 1014.  However, if the decedent's property is stock in a corporation and that corporation owns appreciated capital gains property, then, as a result of the repeal of the General Utilities doctrine, the corporation would have to pay tax on such gain on its liquidation, reducing the value of the corporation.  See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders ¶¶ 8.20, 8.21 (Warren, Gorham & Lamont, 7th ed. 2000).

3.     Post-TRA 1986 until Estate of Davis in 1998

Although subject to the 1986 legislation, as late as 1991, the Commissioner continued to adhere to his pre-1986 position that no capital gains discount was permitted on distributions of closely-held corporate stock, ignoring the fact that a corporate-level income tax now would be incurred upon its liquidation.  See I.R.S. Tech. Adv. Mem. 91-50-001 (1991) (the Commissioner will continue to adhere to his historical rule against allowing a capital gains tax discount).[18]  During this twelve-year period, the Commissioner, while agreeing that a capital gains discount is allowable in theory, and as a matter of law, uniformly denied the discount unless the taxpayer could prove that payment was imminent.  See Estate of Gray v. Comm'r, 73 T.C.M. (CCH) 1940, *9 (1997) (no capital gains tax discount for stock in corporation that held installment note because payment of the note depended upon sale of land by the maker, making the risk of capital gains too speculative to be a factor in valuation).

From 1986 to 1998, taxpayers were unsuccessful in their arguments that the repeal of the General Utilities doctrine made it difficult to avoid capital gains at

_____

[18] See also AOD 1999-001 (Jan. 29, 1999) (the Commissioner will take potential capital gains taxes into account when determining the appropriate discounts for a C corporation, but the amount of the discount and the cases in which it will be allowed will be determined on a case-by-case basis).

the corporate level, and that, therefore, ipso facto a discount for built-in capital

gains should be allowed.  See Estate of Bennett v. Comm'r, 65 T.C.M. (CCH)

1816, *12 (1993); Estate of Ward v. Comm'r, 87 T.C. 78, 104 (1986) (no discount

as there was no evidence that liquidation is imminent or even contemplated).  The

courts continued to adhere to the rigid position that the highly speculative nature

of the tax mandated that its present value be zero.  See Estate of Luton v. Comm'r,

68 T.C.M. (CCH) 1044, *8 (1994).

C.  Historical Evolution of Precedential Case Law on the Issue on Appeal

1.     Estate of Davis - The Tax Court Case

Then, in 1998, twelve years after the TRA 1986 was enacted, the Tax Court

began to relax its historical stance in keeping with the "new" statute.[19]  In Estate of

Davis v. Comm'r, 110 T.C. 530 (1998), the donor gave two blocks of the common

stock of a closely-held holding company to his sons.  The holding company owned

shares of a publicly traded corporation.  Id. at ___.

No liquidation of the holding company or sale of its assets was planned or

contemplated on the valuation date.  No tax was due and owing on the valuation

date.  Estate of Davis, 110 T.C. at ___.  Nevertheless, citing section 5(b) of Rev.

---

[19] It could be speculated that the Tax Court's reversal of position in 1998 was a fait
accompli, forced by the Commissioner's own expert appraiser witness's testimony that he
included within his calculations a discount for capital gains taxes.  Estate of Davis, 110 T.C. ___.

Rul. 59-60, 1959-1 C.B. at 242-43, the Tax Court determined, under an economic reality theory, that a hypothetical buyer and seller would *not* have agreed on that date on a stock price that took *no* account of the corporation's built-in capital gains tax.[20] Id. at ___.[21]

The Tax Court permitted discounts in Estate of Davis, both for a lack of marketability and for a lack of control of the shares. It did not permit a separate discount for contingent tax liability. Id. at ___. The Tax Court concluded that approximately $9 million of the permitted $28 million lack of marketability discount could be attributed to the built-in capital gains of the public corporation's

---

[20] "The value of the stock of a closely-held investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock. For companies of this type the appraiser should determine the fair market values of the assets of the company. . . ." Rev. Rul. 59-60, 1959-1 C.B. at 242; see also IV.A.2., supra.

[21] The court stated:

We are convinced on the record in this case, and we find, that, even though no liquidation of [the corporation] or sale of its assets was planned or contemplated on the valuation date, a hypothetical willing seller and a hypothetical willing buyer would not have agreed on that date on a price for each of the blocks of stock in question that took no account of [the corporation's] built in capital gains tax. We are also persuaded on that record, and we find, that such a willing seller and such a willing buyer of each of the two blocks of [the corporation's] stock at issue would have agreed on a price on the valuation date at which each such block would have changed hands that was less than the price that they would have agreed upon if there had been no . . . built-in capital gains tax as of that date . . . . We have found nothing in the . . . cases on which respondent relies that requires us, as a matter of law, to alter our view . . . .

Estate of Davis, 110 T.C. at ___.

16

stock.[22] Id. at ___.  By so doing, the Tax Court conceded that built-in capital gains

could now be considered, not separately, but as one of the components of the

marketability discount.  Id.

The Commissioner's position was beginning to erode.  The stage was set for

other courts to become involved.[23]

2.    Estate of Eisenberg and Estate of Welch - The Circuit Courts of

Appeal Cases

In Estate of Eisenberg v. Comm'r, 74 T.C.M (CCH) 1046 (1997), the donor

gave away shares of stock in her closely-held corporation.  She owned all 1,000

shares in a corporation whose only asset was a commercial office building.  Id. at

*1.  The corporation's only activity was renting office space in the building to

clients.  There were no plans to sell the building or liquidate the corporation.  Id.

Nevertheless, the donor sought to reduce the value of the gifted shares of

the closely-held corporation to account for the fact that, if its asset was sold, the

---

[22] Accord Estate of Borgatello v. Comm'r, 80 T.C.M. (CCH) 260, 264 (2000) (where, consistent with the Estate of Davis, the Tax Court allowed a 24% valuation discount for future corporate income taxes, but treated it as part of the aggregate 33% discount for lack of marketability); Estate of Dailey v. Comm'r, 82 T.C.M. (CCH) 710 (2001) (where a discount for unrealized capital gains was allowed as part of the lack of marketability discount).

[23] See however Estate of Rodgers v. Comm'r, 77 T.C.M. 1931 (CCH) (1999) (although the taxpayer relied upon the Estate of Davis, the Tax Court refused to allow a discount, also citing the Estate of Davis, this time for the proposition that valuation is necessarily an approximation and a matter of judgment, rather than one of mathematics).

sale would trigger a tax gain to the corporation. Estate of Eisenberg, 74 T.C.M. at *2. The Tax Court, notwithstanding the repeal of the General Utilities doctrine, and still citing its pre-1986 cases, declined to allow the tax discount to the donor on the basis that it was unlikely that a hypothetical buyer would want to liquidate the corporation or sell its underlying assets on the transfer date. Id. at *4. "[T]he primary reason for disallowing a discount for capital gains taxes in this situation is that the tax liability itself is deemed to be speculative," therefore, its discount value should be zero. Id.

The Second Circuit Court of Appeals disagreed. Estate of Eisenberg v. Comm'r, 155 F.3d 50, 57 (2d Cir. 1998). Buoyed by the Tax Court's own recent decision in Estate of Davis, the Second Circuit concluded that, although no liquidation of the corporation or sale of corporate assets was imminent or contemplated at the time of the gift, the requirement of an imminent sale was unnecessary. Id. It was the opinion of the court that a willing buyer would demand a discount to take account of the fact that, sooner or later, the tax would have to be paid.[24] Id.

_____

[24] The Second Circuit cited a (then) recent study surveying CPA valuation experts, attorneys involved in business transactions, and business brokers. The survey illustrated that a large majority of buyers of closely-held stock demanded a discount for contingent capital gains tax liability. See John Gilbert, "After the Repeal of General Utilities: Business Valuations and Contingent Income Taxes on Appreciated Assets," Montana L.Rev. 5 (Nov. 1995).

For the first time since the enactment of TRA 1986, the mandate by the

Commissioner and the Tax Court of an imminent sale or liquidation,

*notwithstanding* the revocation of the General Utilities doctrine, was addressed

directly by a circuit court of appeal:

> The issue is not what a hypothetical willing buyer plans to do with the property, but what considerations affect the fair market value of the property he considers buying. While prior to the [TRA 1986] any buyer of a corporation's stock could avoid potential built-in capital gains tax, there is simply no evidence to dispute that a hypothetical willing buyer today would likely pay less for the shares of a corporation because of a buyer's inability to eliminate the contingent tax liability.

Estate of Eisenberg, 155 F.3d at 57.

"Further, we believe, contrary to the opinion of the Tax Court, since the

General Utilities doctrine has been revoked by statute, a tax liability upon

liquidation or sale for built-in gains is not too speculative in this case." Id. at 58.

The Second Circuit vacated and remanded the Tax Court decision for

recalculation.[25]

---

[25] The Second Circuit used an example from tax treatise, Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 10.41[4] n.11 (Warren, Gorham & Lamont, 6th ed. 1998), to illustrate that a hypothetical buyer and seller would allow a discount for built in capital gains tax:

> In the example, A owns 100% of the stock of X corporation, which owns one asset, a machine with a value of $1,000, and a basis of $200. Bittker assumes a 25% tax rate and points out that if X sells the machine to Z for $1,000, X will pay tax of $200 on the $800 gain. Bittker adds that if Z buys the stock for $1,000 'on

19

There is dicta in Estate of Eisenberg to suggest, however, that it would be incorrect to conclude that the full amount of the potential capital gains tax should be used. Id. at 58 n.15.[26] After the Estate of Eisenberg, disputes between the taxpayers and the Commissioner focused upon the magnitude of the discount allowable, not the legal right of the taxpayers to claim them.[27]

In 2000, the trend continued and moved to a different circuit. See Estate of Welch v. Comm'r, (unpublished) 208 F.3d 213 (6th Cir. 2000).[28] In Estate of Welch, the decedent was a minority shareholder of two closely-held corporations. The primary assets of both corporations consisted of real property, i.e.,

---

the mistaken theory that the stock is worth the value of the corporate assets,' Z will have lost $200 economically 'because it paid too much for the stock, failing to account for the built-in tax liability (which can be viewed as the potential tax on disposition of the machine, or as the potential loss from lock of depreciation on $800 [of] basis that Z will not enjoy.' Because of Z's loss, Bittker concludes, 'Z will want to pay only $800 for the stock, in which even A will have effectively 'paid' the $200 built-in gains tax.'

Estate of Eisenberg, 155 F.3d at 58 n.15.

[26] Based upon the Bittker example, the Second Circuit stated that "[o]ne might conclude . . . that the full amount of the capital gains tax should be subtracted from what would otherwise be the fair market value of the real estate. This would not be a correct conclusion. In this case, we are only addressing how potential tax consequences - the capital gains tax may affect the fair market value of the share of stock appellant gifted to her relatives in contrast to the fair market value of the estate." Estate of Eisenberg, 155 F.3d at 58 n.15.

[27] The Commissioner acquiesced in Estate of Eisenberg, 74 T.C.M. (CCH) 1046 (1997), acq. in result, 1999-4 I.R.B. 4.

[28] While we are aware that this case is unpublished, it is integral to our discussion and has long been included in other analyses of the issue before us.

commercial buildings rented to various tenants. The assets were subject to condemnation and sale after the decedent's death. Id. at *1.

The Tax Court denied the decedent's estate a tax discount on the basis that the estate failed to prove that liquidation of the corporations' assets was likely to occur on the valuation date. Id. at *3. The court so held even though the condemnation and subsequent sale were clearly foreseeable and imminent on the valuation date. Id.

Relying upon the rationale of the Second Circuit in Estate of Eisenberg, the Sixth Circuit found the Tax Court's judgment disallowing any discount in any amount erroneous as a matter of law and remanded to the Tax Court for a hearing. Id. at *5. The court was instructed to determine what a hypothetical, willing buyer would likely pay for the Estate of Welch stock on the valuation date, considering all the facts and circumstances at the time, including the built-in capital gains tax on the corporation's real estate.[29] Id. Similarly to the Second Circuit in the Estate of Eisenberg, there is language to suggest that the Sixth Circuit did not think it appropriate that the discount be on a dollar-for-dollar basis either.[30] Id.

---

[29] The Tax Court had made no previous attempt to undertake this valuation discount. Estate of Welch, 208 F.3d at *6.

[30] See also Martin Bros. Container & Timber Prods. Corp. v Martin, et al., 241 F.Supp.2d 815 (N.D.Ohio 2003), aff'd without opinion, 112 Fed.Appx. 395 (6th Cir. 2004) (unpublished).

21

While neither the Second Circuit in Estate of Eisenberg, nor the Sixth Circuit in the Estate of Welch, seemed keen on granting a 100% discount, neither court prescribed a specific alternative approach either as to the amount of the reduction or a method by which to calculate it. Now that taxpayers have historically prevailed on this issue and are entitled to a discount as a matter of law, the issue shifts to the amount of the discount to be allowed.

3. The Fifth Circuit In Estate of Jameson and Estate of Dunn - A Further Shift in Emerging Case Law

By 2001, the issue presented itself squarely in the Fifth Circuit. In Estate of Jameson v. Comm'r, 267 F.3d 366 (5th Cir. 2001), the decedent owned 98% of the stock of her predeceased husband's closely-held operating company. Id. at 367. The company was both an operating timber company and an investment company. Id. at 367-69.

The Tax Court, based on its recent decision in Estate of Davis, concluded that some discount for built-in capital gains should be acknowledged. Estate of Jameson, 267 F.3d at 371. Using a net asset valuation approach, the Tax Court allowed a partial discount based upon the court's estimate of the net present value for the capital gains tax liability on the timber property that would be incurred as

the timber was cut, over a nine-year period.[31]  Id.  As to the investment property,

the Tax Court refused to allow any capital gains discount for that property.  Id. at

370.

Relying on the Second Circuit case of Estate of Eisenberg, the Fifth Circuit

in the Estate of Jameson concluded that the Tax Court had clearly erred in crafting

its own valuation method.  Id. at 371.  The method was flawed because it was

based upon the Tax Court's conclusive assumption that a strategic, not a

hypothetical, buyer would continue to operate the company for timber production.

Id. at 371-72.

The Fifth Circuit determined that the first, or economically rational,

purchaser of the stock *cannot* be presumed to operate the company.  Estate of

Jameson, 267 F.3d at 371-72.  The rational economic actor or willing buyer would

*have to take into account* the consequences of the unavoidable, substantial built-in

tax liability on the property.  Id.  The economic reality was that any reasonable

willing buyer would consider the company's low basis in the investment property

in determining a purchase price.  Id.

---

[31] This nine-year period was calculated based upon assumptions furnished by the estate, i.e., a 10% annual growth to harvest rate of the timber; a 4% annual inflation rate in the value of the harvest; a 34% capital gains tax rate; and a 20% discount rate.  Estate of Jameson, 267 F.3d at 370.

Citing internally inconsistent assumptions within the Tax Court opinion, the Fifth Circuit vacated the judgment and remanded the case back to the Tax Court. The instructions given were that the Tax Court reconsider the amount of capital gains on the operating timber property, and, to consider and allow a discount for the built-in capital gains on the investment property. Estate of Jameson, 267 F.3d at 372.

A year later, the Fifth Circuit went one step further in Estate of Dunn v. Comm'r, 301 F.3d 339 (5th Cir. 2002). At the time of her death, Mrs. Dunn owned a majority 62.96% of the stock of a family-owned corporation engaged in the rental of heavy equipment. The family company also managed certain commercial property as an investment. Id. at 347.

As Texas corporate law required a 66.66% interest in the voting shares to affect a liquidation, with 62.9%, Mrs. Dunn did not own a "supermajority," or 66.6%, that could force a liquidation. Id. The facts further indicated that the family company planned to remain viable and in operation for some time.[32] Id.

Using a willing buyer-willing seller fair market value test, the Tax Court in the Estate of Dunn, while agreeing with the Commissioner's argument that the tax

---

[32] The Commissioner, continuing to adhere to his historical pre-1986 stance, took the position that the tax was "too speculative" to consider and disallowed any discount. Estate of Dunn, 301 F.3d at 346.

was certainly speculative, still agreed to discount the stock price by 5% of the built-in capital gains as a matter of law. Id. at 347. This holding was in response to the existence of a very small possibility that a hypothetical buyer would liquidate the company. The 5% discount was in lieu of the 34% reduction sought by the taxpayers. Id. The Tax Court concluded that it was much more likely that a hypothetical buyer would continue to operate the company. Id.

The Fifth Circuit disagreed emphatically with the Tax Court. In the Estate of Dunn, under a net asset valuation approach, the Fifth Circuit determined value by totaling the corporation's assets and subtracting its liabilities. It held that a hypothetical willing buyer-willing seller *must always be assumed* to immediately liquidate the corporation, triggering a tax on the built-in gains.[33] Id. at 354. Thereby substantially altering the Tax Court's fair market value test, the Fifth Circuit held, as a matter of law, that, *as a threshold assumption*, liquidation must always be assumed when calculating an asset under the net asset value approach.[34] Id. The Fifth Circuit labeled as a 'red herring' the fact that no liquidation was

---

[33] See also Stephens, Maxfield, Lind et al., Federal Estate and Gift Taxation ¶ 4.02 (Warren, Gorham & Lamont, 8th ed. 2002).

[34] "[T]he 'likelihood' is 100%." Estate of Dunn, 301 F.3d at 350.

imminent or even likely.[35]  Id.

Turning to the proper amount of the discount, the Fifth Circuit concluded

that the value of the assets must be reduced by a discount equal to 100% of the

capital gains liability, dollar for dollar.[36]  Id. at 352.  The court relied upon the

assumption that, in a net asset valuation context, the hypothetical buyer is

predisposed to buy stock to gain control of the company for the sole purpose of

acquiring its underlying assets.  Id.  This, in turn, triggers a tax on the built-in

gains.[37]  Id.  Hence, the discount should be 100%, dollar-for-dollar.  An era of

---

[35] It involves the "quintessential mixing of apples and oranges."  Estate of Dunn, 301 F.3d at 353.

[36] The Fifth Circuit held that:

We are satisfied that the hypothetical willing buyer of the Decedent's block of Dunn Equipment stock would demand a reduction in price for the built-in gains tax liability of the Corporation's assets at essentially 100 cents on the dollar, regardless of his subjective desires or intentions regarding use or disposition of the assets.  Here, that reduction would be 34%.  This is true "in spades" when, for purposes of computing the *asset*-based value of the Corporation, we assume (as we must) that the willing buyer is purchasing the stock to get the assets, whether in or out of corporate solution.  We hold as a matter of law that the built-in gains tax liability of this particular business's assets must be considered as a dollar-for-dollar reduction when calculating the *asset*-based value of the Corporation, just as, conversely, built-in gains tax liability would have no place in the calculation of the Corporation's *earnings*-based value.

Estate of Dunn, 301 F.3d at 352-53 (emphasis in original).  Perhaps by so doing, the court was sending a strong message to the Commissioner about capitalizing on valuation uncertainties to force enhanced compromise tax settlements for the government.

[37] The Fifth Circuit illustrated the dollar-for-dollar reduction by the following example:

Buyer B wants an assemblage of assets identical to Corporation C's assets.  Those

valuation certainty had begun.[38]

### 4. Cases After the Estate of Dunn

In 2004, the Fifth Circuit in Estate of Smith v. Comm'r, 391 F.3d 621 (5th

Cir. 2004), was asked to decide the issue of whether or not, for estate tax purposes,

the value of a decedent's individual retirement accounts (IRAs), containing

marketable stocks and bonds, should be reduced by the amount of potential

income tax liability of the beneficiaries upon distribution from the accounts.

Estate of Smith, 391 F.3d at 626. While acknowledging the recent trend of

considering potential tax liability in valuation cases, the Fifth Circuit declined to

extend Estate of Davis and its progeny, including the Estate of Dunn, to the

---

> assets are worth $1 million on the open market but are depreciated on C's books
> to a tax basis of $500,000. B has two options: (1) He can buy the assets from C
> for $1 million and depreciate them to zero over, e.g., seven years (or buy them on
> the open market and have the same cash flow and tax experience), leaving C to
> pay its own 34% tax ($170,000) on its gain; or (2) he can buy C's stock, get no
> depreciation deductions other than, at the corporate level, to the extent the asset
> are further depreciable, and have a 34% built-in corporate tax liability at sale of
> the assets. Surely a buyer of the stock rather than the asset would insist on a price
> reduction to account for the full amount of the built-in gain tax and the loss of the
> depreciation opportunity.

Estate of Dunn, 301 F.3d at 353 n.23; see also n.42 infra.

[38] In at least one case, the Commissioner has taken an inconsistent position as to dollar-for-dollar recognition. In Simplot v. Comm'r, 112 T.C. 130, 166 n.22 (1999), rev'd on other grounds 249 F.3d 1191 (9th Cir. 2001), the Commissioner presented testimony of an expert witness who concluded that, when valuing a closely-held corporation's interest in publicly traded stock, full recognition of built-in capital gains was appropriate.

valuation of IRAs held by a decedent.[39] <u>Id</u>.

Most recently, in <u>Estate of McCord v. Comm'r</u>, 461 F.3d 614 (5th Cir. 2006), another Fifth Circuit case, the "trend" continues. The case presented an issue of first impression regarding a donee's contingent liability for additional estate taxes after receipt of the gift. <u>Id</u>. at 630-32.

In <u>Estate of McCord</u>, the Commissioner asserted in a notice of deficiency that donor taxpayers had understated the fair market value of their gifted partnership interests on their gift tax returns. <u>Id</u>. at 621. The Commissioner claimed that this error resulted from the donor taxpayers' discounting the fair market value of those gifted interests by the mortality-based, actuarially-calculated present value of the donees' assumed obligations for additional estate taxes. <u>Id</u>.

Finding no error in undervaluation, the Fifth Circuit in <u>Estate of McCord</u>, citing <u>Estate of Dunn</u>, stated:

> For purposes of our willing buyer/willing seller analysis, we perceive no distinguishable difference between the nature of the capital gains tax and its rates on the one hand and the nature of the estate tax and its rates on the other hand. Rates and particular features of both the

---

[39] The value of an IRA should not reflect the potential income tax liability of the beneficiaries upon distribution from the accounts, as an IRA is a different asset, with different tax consequences. <u>See also</u> <u>Estate of Kahn v. Comm'r</u>, 125 T.C. 11 (2005) (where the Tax Court declined to extend <u>Estate of Davis</u> and its progeny, including <u>Estate of Dunn</u>, to IRAs). With IRAs, the tax does not survive the transfer to an unrelated third party, unlike capital gains tax potential which does survive the transfer. <u>See</u> <u>Estate of Smith</u>, 391 F.3d at 629.

capital gains tax and the estate tax have changed and likely will continue to change with irregular frequency; likewise, despite considerable and repeated outcries and many aborted attempts, neither tax has been repealed. Even though the final amount owed by the Taxpayer as *gift* tax on their January 1996 gifts to non-exempt donees has yet to be finally determined (depending, as it does, on the final results of this case), we are satisfied that the transfer tax law and its rates that were in effect when the gifts were made are the ones that willing buyer would insist on in applying in determining whether to insist on, and calculate a discount for § 2035 estate tax liability.

Estate of McCord, 461 F.3d at 630.

The Fifth Circuit thereby extended the rationale of Estate of Davis to a gift tax case involving contingent estate taxes.[40]

D.      Applying the Fifth Circuit Estate of Dunn Rationale to the Present

        Appeal

Juxtaposed against the backdrop of this emerging case law, the question before the Tax Court in this case, and now before us, is what was the value of Jelke's 6.44% interest in CCC on March 4, 1999? Which dollar figure do we use to discount the fair market value of CCC's securities for built-in capital gains on March 4, 1999? Is it dollar-for-dollar, as the estate contends, under the rationale set forth in 2002 by the Fifth Circuit in the Estate of Dunn, or $51 million? Or is

---

[40] The Fifth Circuit, in the Estate of McCord, was never asked to decide whether or not the dollar-for-dollar analysis of the Estate of Dunn applied in the context of contingent estate taxes generated by a gift, as the maximum amount that the donor taxpayers had claimed on their gift tax returns was a discount only for the present value of the date-of-gift of the contingent estate tax obligations assumed by the donees. See Estate of McCord, 461 F.3d at 631.

it the present value of the capital gains indexed over a sixteen-year period, as the Commissioner contends, or $21 million?

Is the Commissioner's present value approach incomplete and inconsistent, as the estate contends, as CCC's securities will very likely appreciate over this time period, thereby increasing capital gains tax liabilities and undermining the rationality of a present value approach? What if the value of CCC's securities were to decline over this sixteen-year period, and, concomitantly, the capital gains tax also declined?

Is the Commissioner correct in contending that the Estate of Dunn's threshold "assumption of liquidation" is unreasonable and unrealistic in the present case as CCC is precluded from liquidation until 2019? Does such a minority interest such as we have here, with no power to "force" CCC's liquidation, render the Estate of Dunn distinguishable, as it concerned a majority interest? Does it matter that the corporation in the Estate of Dunn was primarily an operating company, while CCC is exclusively an investment holding company?

Recently, on other issues and other facts, in Estate of Blount v. Comm'r, 428 F.3d 1338 (11th Cir. 2005), we were also asked to determine the fair market value of shares of stock in a closely-held corporation owned by a decedent for

estate tax purposes.[41]  Id.  An economic reality approach to valuation, in its dicta, is referenced:  "To suggest that a reasonably competent business person, interested in acquiring a company, would ignore a $3 million liability strains credulity and defies any sensible construct of fair market value."  Id. at 1346.  To properly reflect the economic realities of the transaction, in other words, it is important to take liability costs into account when negotiating a market-supported price for a share of a company's stock, such as CCC, for example.

In our case, why would a hypothetical willing buyer of CCC shares not adjust his or her purchase price to reflect the entire $51 million amount of CCC's built-in capital gains tax liability?  The buyer could just as easily venture into the open marketplace and acquire an identical portfolio of blue chip domestic and international securities as those held by CCC.  Yet the buyer could accomplish this without any risk exposure to the underlying tax liability lurking within CCC due to its low cost basis in the securities.[42]

---

[41] Insurance proceeds paid to a company upon a shareholder's death are not to be included in calculating the company's fair market value due to the company's contractual obligation to buy the decedent's shares.  Estate of Blount, 428 F.3d at 1345.

[42] Consider the following example:

[T]wo corporations each owning a portfolio of publicly traded securities having the same aggregate fair market value.  Where these two companies differ concerns the purchase price each had to pay to amass the respective portfolios.  The higher investment cost for one of the corporations will produce a lower corporate income tax liability in comparison to the other corporation even though each corporation,

31

Here, the Tax Court distinguished the majority interest held by the decedent in the Estate of Dunn from our case on the basis that the Jelke estate's minority interest was single-handedly insufficient to "force" a liquidation on its own. The Tax Court chose a sixteen-year period to reflect when the corporation would reasonably incur the tax. This distinction is not persuasive to us. We are dealing with hypothetical, not strategic, willing buyers and willing sellers. As a threshold assumption, we are to proceed under the arbitrary assumption that a liquidation takes place on the date of death. Assets and liabilities are deemed frozen in value on the date of death and a "snap shot" of value taken. Whether or not a majority or a minority interest is present is of no moment in an assumption of liquidation setting.

The Commissioner also argues that the Estate of Dunn is distinguishable on its facts as the company being valued was primarily an operating company and CCC is an investment holding company. As the company in the Estate of Dunn was both an operating company and an investment company, the Fifth Circuit was

should it decide to, sells the portfolio for the same price. In choosing which corporation to acquire, little doubt exists that a prospective purchaser of the stock of either of these corporations would be unwilling to pay the same price for each corporation knowing full well the potential for a greater income tax bite for the corporation with the lower investment cost in its assets.

Mark R. Siegel, "Recognizing Asset Value and Tax Basis Disparities to Value Closely-held Stock," 58 Baylor L.Rev. 861, 862-63 (Fall 2006); see also supra note 37.

forced to use two different methods of valuation, an earnings-based valuation method for the operating side of the company, and a net asset valuation method for the investment side. It assigned a percentage weight to them of 85% and 15%, respectively. Estate of Dunn, 301 F.3d at 358-59.

Here, CCC was solely an investment holding company. We need examine only the Estate of Dunn analysis as it applies to the net asset valuation method used in valuing investment holding companies; there is no need for weighting. The Commissioner's argument on this point is without merit.

It is only recently that, the Tax Court in the Estate of Davis, the Second Circuit in the Estate of Eisenberg and the Sixth Circuit in the Estate of Welch, courts are receptive to the concept that some sort of discount for capital gains tax liability exists.[43] Yet, in the more than twenty years since the TRA 1986 was enacted, none of these three cases provide any precise rules for calculating the downward adjustment with any specificity, nor give guidance to tax practitioners in future cases.

The Fifth Circuit in the Estate of Dunn is the first court to emerge with a precise valuation approach as to the amount of the reduction and how to calculate

---

[43] We are aware that dicta in the courts of appeal cases indicates a discount of less than 100%.

it. As a threshold matter, the court creates the arbitrary assumption that all assets are sold in liquidation on the valuation date, and 100% of the built-in capital gains tax liability is offset against the fair market value of the stock, dollar-for-dollar.[44] Estate of Dunn, 301 F.3d at 352-54.

Cases prior to the Estate of Dunn, prophesying as to when the assets will be sold and reducing the tax liability to present value, depending upon the length of time discerned by the court over which these taxes shall be paid, require a crystal ball. The longer the time, the lower the discount. The shorter the time, the higher the discount.

The downside of this approach is that, not only is it fluidly ethereal, it requires a type of hunt-and-peck forecasting by the courts. In reality, this method could cause the Commissioner to revive his "too speculative a tax" contentions made prior to the Estate of Davis in 1998. This methodology requires us to either gaze into a crystal ball, flip a coin, or, at the very least, split the difference between the present value calculation projections of the taxpayers on the one hand, and the present value calculation projections of the Commissioner, on the other.

---

[44] Even the Commissioner in this case agrees that the fair market value of CCC's assets and liabilities must be frozen on the valuation date. See Red Brief, at 41. Other than to describe the Fifth Circuit's methodology in Estate of Dunn as "unreasonable" and "unrealistic," the Commissioner provides no authority in support of his position.

34

We think the approach set forth by the Fifth Circuit in the <u>Estate of Dunn</u> is the better of the two.  The estate tax owed is calculated based upon a "snap shot of valuation" frozen on the date of Jelke's death, taking into account only those facts known on that date.  It is more logical and appropriate to value the shares of CCC stock on the date of death based upon an assumption that a liquidation has occurred, without resort to present values or prophesies.

The rationale of the Fifth Circuit in the <u>Estate of Dunn</u> eliminates the crystal ball and the coin flip and provides certainty and finality to valuation as best it can, already a vague and shadowy undertaking.  It is a welcome road map for those in the judiciary, not formally trained in the art of valuation.

The <u>Estate of Dunn</u> dollar-for-dollar approach also bypasses the unnecessary expenditure of judicial resources being used to wade through a myriad of divergent expert witness testimony, based upon subjective conjecture, and divergent opinions.  The <u>Estate of Dunn</u> has the virtue of simplicity and its methodology provides a practical and theoretically sound foundation as to how to address the discount issue.

The Fifth Circuit preempted its critics by stating:  "As the methodology we employ today may well be viewed by some (valuation) professionals as unsophisticated, dogmatic, overly simplistic, or just plain wrong, we consciously

35

assume the risk of incurring such criticism from the business appraisal community.

. . In this regard, we observe that on the end of the methodology spectrum opposite

*oversimplification* lies *over-engineering*." Estate of Dunn, 301 F.3d at 358 n.36

(emphasis in original).

This type of "economic reality approach" mimics the marketplace and

places a practical, transactional overlay upon the proverbial willing buyer-willing

seller analysis.  It allows the issue to conform to the reality of the depressing

economic effect that the lurking taxes have on the market selling price.  The

hypothetical willing buyer is a rational, economic actor.  Common sense tells us

that he or she would not pay the same price for identical blocks of stock, one

purchased outright in the marketplace with no tax consequences, and one acquired

through the purchase of shares in a closely-held corporation, with significant,

built-in tax consequences.

This 100% approach settles the issue as a matter of law, and provides

certainty that is typically missing in the valuation arena.  We thereby follow the

rationale of the Fifth Circuit in the Estate of Dunn, that allows a dollar-for-dollar,

$51 million discount for contingent capital gains taxes in valuing CCC on the date

of Jelke's death, and his 6.44% interest therein.  This result prevents grossly

inequitable results from occurring and also prevents us, the federal judiciary, from

assuming the role of arbitrary business consultants.[45]

## V. CONCLUSION

Based upon the foregoing discussion, as a matter of law, under a de novo review, we vacate the judgment of the Tax Court and remand with instructions that the Tax Court recalculate the net asset value of CCC on the date of Jelke's death, and his 6.44% interest therein, using a dollar-for-dollar reduction of the entire $51 million in built-in capital gains tax liability, under the assumption that CCC is liquidated on the date of death and all assets sold.

VACATED and REMANDED with INSTRUCTIONS.

---

[45] Given the maximum capital gains tax rate at this writing of 15% for future cases, one can only speculate that the maximum capital gains tax rate will not again approach the 34% range seen in previous cases.

CARNES, Circuit Judge, dissenting:

The tax code is nowhere near the center of my intellectual life, and generally I find estate tax law about as exciting as Hegel's metaphysical theory of the identity of opposites. There is, however, more involved in this case than just the estate tax issue presented, which is how to determine the fair market value of the decedent's distinctly minority interest in CCC, a closely held corporation whose assets consist primarily of marketable securities with a built-in capital gains tax liability.

The broader principles implicated by the majority opinion are timeless. They were discussed by Teddy Roosevelt at the close of the century before last:

> I wish to preach not the doctrine of ignoble ease but the doctrine of the strenuous life; the life of toil and effort; of labor and strife; to preach that highest form of success which comes not to the man who desires mere easy peace but to the man who does not shrink from danger, from hardship, or from bitter toil, and who out of these wins the splendid ultimate triumph.

Vice President Theodore Roosevelt, The Strenuous Life, Address before the Hamilton Club in Chicago, Illinois (April 10, 1899), in The Penguin Book of Twentieth-Century Speeches 1 (Brian MacArthur ed., 1992). By adopting and extending the arbitrary assumption rule of least effort from Estate of Dunn v. Commissioner, 301 F.3d 339 (5th Cir. 2002), the majority gives in to the judicial

38

equivalent of the doctrine of ignoble ease. To avoid the effort, labor, and toil that is required for a more accurate calculation of the estate tax due, the majority simply assumes a result that we all know is wrong. We can do better than that. The tax court did.

The corporation whose assets are being valued in this case is a holding company with a portfolio of widely traded securities whose value can be readily determined. Estate of Jelke v. Comm'r, No. 3512-03, 2005 WL 1277407, at *1, 3 (T.C. May 31, 2005). The rate at which the company had liquidated the securities it held in the five years before the decedent's death is also known to one one-hundredth of a percent. Id. at *2, 8. The parties agreed that the value of the company's net assets at the time of death is what counts, and they agreed that the market value of the securities it held at the time of death should be reduced by some amount for the capital gains tax liability attached to the securities. Id. at *3. That is what the law provides. See 26 C.F.R. § 20.2031-1(b) ("The value of every item of property includible in a decedent's gross estate . . . is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."); Estate of Blount v. Comm'r, 428 F.3d 1338, 1346 (11th Cir. 2005). The disagreement is over how to calculate that reduction in

39

value.  Jelke, 2005 WL 1277407, at *3 ("[T]he parties differ as to the amount of the reduction from the value for the potential capital gain tax liability that would arise upon sale of the marketable securities held by the corporation.").

The estate contends that the full amount of the capital gains tax liability should be deducted from the value of the securities as though they had been sold at the time of death, even though they were not.  Id.  The IRS wants the capital gains reduction calculated based on projecting the average rate of past liquidation forward and then discounting the taxes that will come due in the future back to present value at the time of death.  Id.

The Tax Court summarized the estate's contention, which was put forward by its expert, Mr. Frazier, as follows:

> After discussing several methods, Mr. Frazier used what he described as a combination of the market and asset approaches.  Mr. Frazier used the market approach to value CCC's securities.  Purporting to rely on the asset approach to valuation, Mr. Frazier then reduced the total of the market prices for CCC's securities by the liabilities shown on CCC's books and the tax liability that would have been incurred if all of CCC's securities had been sold on decedent's date of death.  Mr. Frazier did not make adjustments to the tax liability for the possibility that sales of CCC's securities would have occurred after decedent's date of death.  In other words, Mr. Frazier relied on the net asset method to employ an assumption of liquidation as of the valuation date, an event which would trigger recognition of $51,626,884 in capital gain tax.  This method produced a $137,008,949 [] value for CCC.  Mr. Frazier then computed an undiscounted value of $8,823,062 for decedent's 6.44-percent interest

40

(3,000 of 46,585.51 shares) held in trust.

Id. at *8.

The Tax Court summarized the IRS's contention, put forward by its expert,

Mr. Shaked, as follows:

> Respondent's expert, Mr. Shaked, started with the same market value of CCC's securities. Mr. Shaked then reduced the assets by liabilities, but he used a different approach from Mr. Frazier's in arriving at a reduction for the built-in capital gain tax liability. First, he computed CCC's average securities turnover by reference to the most recent data (1994–98). Using that data, Mr. Shaked computed a 5.95-percent average annual turnover derived from the parties' stipulated asset turnover rates for 1994–98. Mr. Shaked believed that the 5.95-percent rate was conservative, because the turnover trend was generally decreasing. The use of the 5.95-percent turnover rate results in the capital gain tax's being incurred over a 16.8-year period (100 percent divided by 5.95 percent).

> Mr. Shaked then divided the $51,626,884 tax liability by 16 years to arrive at the average annual capital gain tax liability that would have been incurred each year over this 16-year period – $3,226,680.25 ($51,626,884 divided by 16). Next, he selected a 13.2-percent discount rate based on the average annual rate of return for large-cap stocks in the period from 1926 to 1998, as described in Ibbotson Associates Stocks, Bonds, Bills & Inflation, 1999 Yearbook (Ibbotson 1999). He then computed the present value of the $3,226,680.25 annual tax liability discounted over 16 years using a 13.2-percent interest rate to arrive at a present value for the total capital gain tax liability of $21,082,226. By reducing the $188,635,833 net asset value by the $21,082,226 future tax liability, Mr. Shaked arrived at a $167,553,607 value for CCC. Finally, Mr. Shaked concluded that the undiscounted value for decedent's 6.44-percent interest in CCC was $10,789,164 in contrast to Mr. Frazier's undiscounted value of $8,823,062. This difference reflects

numerically the parties' differing approaches to the amount of capital gain tax that should be used to reduce the net asset value of CCC.

Id. at *8–9 (footnote omitted).

The Tax Court adopted the IRS's real value approach, even though it is more complicated than the estate's simple but arbitrary assumption that all of the assets were sold at the time of death. Id. at *11–12. The court chose the real value approach because it produces a result closer to the actual value of the company's assets, which in turn leads to a more accurate determination of the sales price a willing buyer and seller would agree on for the shares of the holding company that Jelke owned on the date of his death. Id.

While the real value approach is not perfect and itself makes some assumptions—such as the past rate of liquidation continuing in the future—it produces a more accurate result than the arbitrary assumption method because it more closely reflects the economic interests of those who control the company. The death of one who holds only 6.44 percent of the shares of a holding company, id. at *2, that has been producing an average annual rate of return of more than 23 percent on securities, id., and that has substantial built-in capital gains taxes, id. at *3, is not going to prompt the liquidation of all of the company's assets. It would be economically foolish for the majority shareholders to gut the golden goose and

bring down on their heads the embedded capital gains tax liability simply because of the death of a minority shareholder, an event of no relevance to their economic interests.

The majority's approach assumes that the holding company was liquidated on the date of Jelke's death, and therefore all of its built-in capital gains were incurred (and therefore passed on to its shareholders) immediately. Maj. Op. at 36–37. The majority makes that assumption despite the fact that: historically the company has sold only 5.95 percent of its investments and therefore precipitated only that small portion of the total built-in capital gains liability per year, Jelke, 2005 WL 1277407, at *8; the company is earning an annual return of more than 23 percent on its portfolio investments, id. at *2; and, "[a]s of the date of decedent's death, CCC's board of directors had no plans to liquidate an appreciable portion of CCC's portfolio, and they intended to operate CCC as a going concern," id. Under these circumstances, the notion that the company would suddenly dispose of its highly profitable portfolio, ending the enviable earnings stream, and inflicting a substantial capital gains tax on its shareholders is preposterous. The fact that Jelke died does not make it any less so.

The death of a human being is profoundly important to the person who dies, but it matters not one whit to the laws of economics, which dictate the self-interest

of the living. Because the interests of the majority shareholders did not change when Jelke died, the only reasonable expectation is that the holding company will continue to be run as it was before that immaterial event occurred. Yet, the majority insists on pretending that contrary to the economic interests of its shareholders, and contrary to everything that has come before, the company must be assumed to have sold all of its securities on the date of Jelke's death.

The majority suggests that subtracting the entire $51 million in embedded capital gains liability from the $188.6 million value of the company's portfolio is the best approach, because "why would a hypothetical willing buyer of CCC shares not adjust his or her purchase price to reflect the entire $51 million amount of CCC's built-in capital gains tax liability?" Maj. Op. at 31. The answer, of course, is that the buyer would adjust downward the price he was willing to pay in order to reflect that liability, but the buyer could not reasonably expect the seller to agree to a price that ignored completely the time value of money. No rational seller would accept a price that subtracted the entire amount of the future tax liability as though it were due immediately, when that liability will almost certainly be spread out over future years instead—the next 16.8 years if existing practices continue. Jelke, 2005 WL 1277407, at *8. Assets with liabilities that will not come due until future years are worth more than those with the same

44

amount of liabilities that are due immediately.

Any rational being would prefer to pay $51 million in taxes spread out over the next 16.8 years, which is how long it would take for the embedded tax liability to come fully due under the company's historical rate of liquidation, instead of paying the entire $51 million immediately.  Ask yourself:  If you had the choice would you prefer to pay the taxes you are going to owe over the next 16 or so years in advance, right now, or would you choose to pay those taxes only when they come due in the future?  The majority would assume, because it makes the calculations easier, that you would choose to pay all of your future taxes now.

When tax liabilities and payments are spread out over future years a taxpayer is able to use the unpaid funds to earn more money until the taxes actually do come due.  When the amount involved is $51 million and the portion of it that can be invested declines at a rate of only 5.95 percent per year, the interest, dividends, and capital gains that can be earned using that slowly declining balance (and the accumulated earnings that flow from it) are enormous.  Ask yourself:   Would you put any value on the earnings you could get from investing a declining balance of  $51 million, which diminishes at the rate of only 5.95 percent per year, or would you think that all of the money you could earn with the use of that declining principal over the next 16 years would be negligible?  The

45

majority's assumption makes sense only to those who would place no value on the earnings that could be made with the use of $51 million in investment principal as it declines at a rate of 5.95 percent each year for the next 16.8 years.

The majority asserts that a buyer "would not pay the same price for identical blocks of stock, one purchased outright in the marketplace with no tax consequences, and one acquired through the purchase of shares in a closely-held corporation." Maj. Op. at 36. Of course not. But we are not talking about the same price. We are talking about a price between two extremes. One extreme is the majority's approach, which assumes that tax consequences that are likely to come due gradually, over a period of 16.8 future years, have the same effect on price as those that are due immediately. The other extreme, which is the straw man the majority erects, assumes that tax consequences have no effect at all on price. But that is not the position the Tax Court took. Instead, the Tax Court position recognizes that the embedded tax liability will affect price and calculates how much effect it will have, taking into account the size of the tax liability and when it is likely to become due. The Tax Court's calculation, which is based on the facts, produces a result that is closer to reality than the majority's assumption of instant liquidation.

To its credit, the majority concedes that its approach is arbitrary. The

majority describes its operating premise that a holding company would instantly liquidate its entire investment portfolio on the date of a minority shareholder's death as an "arbitrary assumption." Maj. Op. at 34. Seeking to justify its approach, the majority argues that being arbitrary "provides certainty and finality" and "bypasses the unnecessary expenditure of judicial resources" that is required to make a more realistic calculation. Id. at 35. Indeed, it does. Of course, the same could be said about any arbitrary assumption, including one that the securities had no value at all or that the capital gains tax liability would never actually be paid for some unknown reason. Either of those arbitrary assumptions would also avoid the unnecessary expenditure of judicial resources while providing certainty and finality. Once the doctrine of ignoble ease and seductive simplicity is allowed to reign, there is no end to the shortcuts that can be taken.

If the majority's approach is good, the good it provides should not be confined to estate tax law. It should be shared with all areas of the law. To take one example of how the majority's approach can work its magic, consider the daunting task of calculating the lost future earnings award in the case of one who has been disabled or killed by a tortfeasor. In Culver v. Slater Boat Co., 722 F.2d 114 (Former 5th Cir. 1983) (en banc), our predecessor Court held that: "The calculation of damages suffered either by a person whose personal injuries will

result in extended future disability or by the representatives of a deceased person involves four steps: estimating the loss of work life resulting from the injury or death, calculating the lost income stream, computing the total damage, and discounting that amount to its present value." Id. at 117. Doing all of that requires a lot of judicial effort as even a cursory reading of the Culver opinion shows.

But no longer is all that bother necessary. The parties need not quarrel over, and courts need not concern themselves with, all the variables that go into calculating a fair award for lost future earnings. After all, the quest for a best estimate of economic reality in such a case is, in the majority's view: "fluidly etheral," it involves "hunt-and-peck forecasting," it is like "flip[ping] a coin," and it is no better than "gaz[ing] into a crystal ball." Maj. Op. at 34.

The alternative to its arbitrary assumption, the majority says, is having courts "prophesying." Id. So it is, and so it has been throughout the history of our judicial system, because sometimes prophesying is necessary. As is so often the case, the words of Justice Holmes are instructive. In Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S. Ct. 291 (1929), he wrote for the Court, holding that for the purposes of calculating an estate's charitable deduction for bequeathing the remainder interest in a trust, the value of the trust assets given to the charity had to

be discounted by the decedent's widow's life estate in the trust. The value of the life estate, in turn, had to be calculated based on the statistically probable (or as our majority would say, "prophesied") length of the widow's life. Holmes explained:

> [T]he value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market. Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future, and the value is no less real at that time if later the prophecy turns out false than when it comes out true.

Id. at 155, 49 S. Ct. at 292 (citations omitted); accord Rev. Rul. 59-60 § 3.03, 1959-1 C.B. 237 ("Valuation of securities is, in essence, a prophesy as to the future and must be based on facts available at the required date of appraisal."); see also Culver, 722 F.2d at 123 ("Courts are not prophets and juries are not seers. In making awards to compensate injured plaintiffs or the dependents of deceased workers for loss of future earnings, however, these fact-finders must attempt, in some degree, to gauge future events.").

From now on, the majority opinion indicates, there are to be no more prophesies. For example, in cases like Culver we can just arbitrarily assume that whenever someone dies or is injured the value of the future earnings they have lost is $1 million dollars, or $10 million, or zero dollars. Or we can take the

decedent's previous year's earnings, if it is not too much trouble to figure them out, and multiply that amount by some arbitrary number (perhaps the number of years the dead man's father or grandfather lived), and we can forget about discounting future losses to present value. Which dollar figure or multiple of the last year of earnings that we arbitrarily assume will not matter, except of course to the parties themselves and to those who believe that the law ought to strive for results that seek to approximate reality, even when it requires a little prophesy.

The advantages of the majority's method flow from the simplicity that comes from being arbitrary. The more arbitrary the assumption the less that application of it will be hindered by the reality of bothersome facts which are burdensome to find. Adopting this method will "provide[] certainty and finality" and "bypass[] the unnecessary expenditure of judicial resources," relieving courts of the burden of doing what courts are designed to do, which is find facts and apply the law to them. Maj. Op. at 35. Writing the doctrine of ignoble ease into the law will have its advantages.

Of course, we are going to have to overrule some precedent, or perhaps in keeping with the majority's decisional motif we can just arbitrarily assume that the conflicting precedent does not exist. The precedent established by the en banc Court in the Culver case nearly a quarter of a century ago will have to be thrown

50

overboard, but it is just an admiralty decision anyway.

We will also have to get rid of the Meader ex rel. Long v. United States, 881 F.2d 1056 (11th Cir. 1989), precedent and decisions like it. The Meader case arose under the Federal Tort Claims Act and involved the calculation of an award for future medical expenses and lost future earnings. We held, among other things, that "[i]t is a settled principle of law that [such] an award . . . must be adjusted to its present value to account for two factors: first, the interest the award will earn before it is used to pay for medical expenses or to replace earnings; second, the depreciation the award will suffer over time on account of inflation." Meader, 881 F.2d at 1057–58; see also Dempsey ex rel. Dempsey v. United States, 32 F.3d 1490, 1492 (11th Cir. 1994) (FTCA medical malpractice case stemming from injuries to a newborn, required not only calculating an award for future medical expenses but also calculating a dollar value for the parent's "loss of society and affection of the child" and their loss of the child's services in the future).

Then there is our decision of just a few months ago in Advanced Telecommunications Network, Inc. v. Allen (In re Advanced Telecommunications Network, Inc.), 490 F.3d 1325 (11th Cir. 2007). There the bankruptcy court had been faced with the difficulty of valuing a company's contingent liability arising

51

from pending litigation against it in state court. Not sure how the result of that litigation against the company could have been predicted, the bankruptcy court took the easy way out and arbitrarily assumed that the value of the contingent liability was zero. Id. at 1335–36. In reversing, we explained:

> Although it may be true, as the bankruptcy court put it, that "no one could have predicted this result with any reasonable certainty," such a precise prediction was not required. The court was instead required to calculate the present value of the liability—the expected cost of the liability times the estimated chance of it ever occurring. Unless either the expected cost or the chances of it occurring are equal to zero (that is, the liability is costless, or the chances of it happening are negligible), the estimated value should be more than zero.

Id. at 1335 (emphasis omitted).

The majority approach in the present case cannot be reconciled with our holding in the Advanced Telecommunications case. Requiring a district court to predict the amount of damages that may be awarded in a pending lawsuit and then to discount that amount by its estimate of the chance of a liability verdict is, the majority here would say, equivalent to "flip[ping] a coin" and is no better than "gaz[ing] into a crystal ball." Maj. Op. at 34. So, the Advanced Telecommunications decision, like so many others of ours that require estimating present value based on predictions about future events, will have to go. All of those prior precedents will have to yield to the easy arbitrary assumption method

52

of valuation, to the judicial equivalent of the doctrine of ignoble ease.

Teddy Roosevelt is not the only one who extolled the virtue of toil and effort. Henry James once advised a young friend that, "I have in my own fashion learned the lesson that life is effort, unremittingly repeated, and . . . I feel somehow as if real pity were for those who had been beguiled into the perilous delusion that it isn't." Letter from Henry James to Charles Eliot Norton (May 6, 1872), in 1 Henry James Letters,1843–1875, at 276 (Leon Edel ed., 1974). I dissent from the majority's perilous delusion.